UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY BAILEY-BANKS, | No. 1:15-cv-01839-AWI-JDP (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATIONS THAT COURT DENY PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| W.L. MONTGOMERY, | OBJECTIONS DUE IN 14 DAYS |
| Respondent. | ECF No. 1 |

Petitioner Larry Bailey-Banks, a state prisoner without counsel, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner raises numerous claims, including prosecutorial misconduct, ineffective assistance of counsel, errors in jury instructions, and violations of due process. We recommend that the court deny the petition.

## I. Background

Petitioner challenges his conviction and sentence for aiding and abetting burglary and robbery. According to the government, petitioner drove his codefendants Rayshaun Brown and Andrew Smith to an apartment building. Petitioner waited in a car while Brown and Smith broke into the apartment and robbed a victim. All three individuals were members of the West Side Crips. Smith entered into a plea agreement; petitioner and Brown pleaded not guilty and were then tried together. The jury found petitioner guilty of aiding and abetting first-degree robbery (Count 1), aiding and abetting first-degree burglary (Count 3), unlawful participation in a criminal

1

street gang (Count 4), receiving stolen property (Count 6), and being an accessory after the fact (Count 7). Petitioner had two prior strikes under California's Three-Strikes Law. The trial court sentenced petitioner to an aggregate term of twenty-six years to life, plus a ten-year enhancement for gang activity and another ten-year enhancement because petitioner had a prior felony. CT 2:423, 428.[1]

We set forth below the facts of the underlying offenses, as stated by the California Court of Appeal, Fifth District. A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

> On October 21, 2010, Jacqueline Garcia and her children lived in an apartment on Pacheco Road and Eve Street in Bakersfield. At some point before noon, Garcia was resting in bed, and her children were not home. She was awakened by noise coming from her kitchen window, and the sound of someone falling from a height. Garcia testified two young men suddenly appeared in her bedroom. One man put his hand over Garcia's eyes and mouth, held a gun to her head, and pushed her to the floor. The gunman told her to get up, and he took her around the apartment. The gunman told his accomplice to start looking for stuff. Garcia could not speak English and could not understand what they were looking for.
>
> Garcia testified the men looked through her home and made a "disaster of the place." The gunman seemed to be giving orders to the second man about what to do. The gunman continued to hold the gun to Garcia's head. The second man found a small safe. Garcia stored documents and jewelry in it, but it did not contain any money. The safe was locked, however, and the culprits did not know what was inside.
>
> After they found the safe, the gunman again forced Garcia to the floor. She saw and heard the gunman pull back the slide and chamber a round in the gun. She also heard a metallic sound. She believed the gunman was going to kill her and thought she was dead. However, the gunman did not fire and both men left the apartment with the safe.
>
> . . .

---

[1] All "CT" citations refer to the clerk's transcript. All "SCT" citations refer to the supplements to the clerk's transcript. All "RT" citations refer to the reporter's transcript. These documents have been lodged with the court. *See* ECF No. 22.

### *Discovery of the safe*

On the same day, Michael Bowen was cleaning out his apartment on North Half Moon Drive in Bakersfield. He spent the morning throwing out trash in the garbage can located in the alley behind his apartment. Later in the afternoon, he noticed a second garbage can had been pulled next to the garbage can he had been using. The second garbage can had not been there earlier in the day.

Bowen opened the lid and looked inside the second garbage can. He saw a small safe that appeared to have been slammed or pried open. There were numerous papers and documents inside and around the safe. Bowen called the police.

At 2:45 p.m., Officers Ashby and Juarez responded to Bowen's location in the alley. They looked through the safe and found numerous documents that belonged to Garcia. The same garbage can that contained the safe also contained utility bills addressed to defendant Bailey and his girlfriend, Tiffany Jackson.

. . .

### *Bailey yells at Brown at the police department*

Bailey and Brown were arrested. Brown had a cell phone which contained a photograph of him making a hand gesture of the letter "W," and a separate photograph that showed the phrase "West Side."

Both defendants were taken to the police department and placed in separate but adjoining interrogation rooms, which had solid doors and walls. These rooms were located within the larger squad room, and the officers used them as holding cells. The defendants could not see each other, but they knew they were in the adjoining rooms.

Officers Woessner and Ashby removed Brown from the interrogation room and interviewed him in another area adjacent to the squad room. They asked Brown if he was involved in the burglary/robbery at the apartment on Pacheco Road. Brown said he did not have anything to do with it. The officers returned Brown to the interrogation room adjacent to where Bailey was still being held.

Officer Juarez testified he was in the squad room, and Bailey and Brown were in the adjacent interrogation rooms, when Juarez heard Bailey yell something at Brown. Bailey's voice was muffled but loud enough to be heard by the officers in the squad room.

Officer Woessner testified he was also in the squad room and heard Bailey talk to Brown in a loud voice through the wall, "something to the effect of, 'Tell those officers that I didn't do anything,' " and " 'You know my situation. I can't get another case,' or something similar to that."

Shortly after the officers heard Bailey yell at Brown, Brown asked to speak to Officer Woessner again. Brown was removed from his interrogation room and questioned. Brown said he committed the robbery with a man known as "Lil' Rags" or "Baby Rags," who was later identified as Andrew Smith.[4] Brown did not implicate Bailey in any way. Instead, he said that Smith drove him to the apartment building and parked on the corner of Eve Street. Smith told Brown that someone lived in an apartment, and that person sold crystal methamphetamine and had cash. Smith climbed through the apartment's kitchen window and opened the front door for Brown. Smith pulled the gun and pointed it at the woman in the apartment. Brown searched the apartment and found the safe. Brown said he grabbed the safe, and they left the apartment. Brown dropped the safe. Smith helped him carry it, and they went back to Smith's car. They drove to the alley and tried to open the safe. Smith threw the safe against the ground.

### The GPS monitoring device on Bailey

At the time of the crime, Bailey was on parole as a gang member, and was required to wear a GPS monitoring device. The GPS device showed the subject's locations, and when the subject was walking, traveling at a faster rate in a vehicle, or not moving at all.

The officers retrieved Bailey's GPS tracking data after Bailey had been arrested. Bailey's GPS tracking data showed that on the day of the burglary/robbery, he was on Pacheco Road at 11:28 a.m., and moving at 40 miles per hour, presumably in a vehicle. At 11:29 a.m., he was not moving and was stationary. At 11:32 a.m., he moved to a different location. At 11:34 a.m., he was stationary, and near the intersection of Pacheco Road and Pamela Street, which was near Garcia's apartment building. He remained at that location until 11:41 a.m., when he moved north on Eve Street at 30 miles per hour. At 11:51 a.m., he was moving at 24 miles per hour. At 11:52 a.m., he was not moving and remained stationary at a residence in the area of North Half Moon Drive. At 11:57 a.m., he was walking at one mile per hour. At 11:59 a.m., he was stationary on North Half Moon Drive. At 12:03 p.m., he was moving on Edgemont Drive at 32 miles per hour.

### GANG EVIDENCE

Detective Travis Harless, a member of the Bakersfield Police Department's gang unit, testified as the prosecution's gang expert that Bailey, Brown, and Andrew Smith were members of the West Side Crips. The West Side Crips had geographical subset gangs which included 6th Street, Black Family, Q Court, Carnation Track, and Turq Rag.

The West Side Crips claim the color turquoise, the number six, and the letters "W," "WS," and "WSC." The gang's primary activities are murders, assaults, stabbings, shootings, carjackings, auto thefts, burglaries, and drug sales.

Lowell Park is in the middle of the West Side Crips' territory, and members of rival gangs are not allowed to enter the park. The gang regularly uses the park for meetings and gang-related events, including the annual "Hood Day" on June 6. Detective Eric Lantz explained that on Hood Day, large numbers of the West Side Crips "don their turquoise colors and black T-shirts, things like that, and they will flood the Lowell Park and the surrounding areas" in the heart of West Side territory. The event is held on June 6 since the West Side Crips identify with "6/6," referring to the 6th Street subset gang, and the park is located on 6th Street.

### *Bailey's gang contacts*

The prosecution presented evidence that Bailey was an active member of the West Side Crips when the instant offenses were committed. Detective Lantz testified he had numerous contacts with Bailey, and described him as a "significant" person in the West Side Crips. In July and October 2006, Lantz had contacts with Bailey while he was in the presence of known members of the West Side Crips, including Clarence Wandick. Bailey had numerous tattoos that signified the West Side Crips. He said his moniker was "Skeeter," and he admitted membership in the gang.

Detective Lantz and other officers conducted surveillance during the Hood Day events held by the West Side Crips at Lowell Park in 2009 and 2010. There were over 100 people at the park, including known members of the West Side Crips. Bailey was present and associated with other gang members.

Bailey had been booked into county jail on 13 separate occasions. He claimed to belong to or associate with the West Side Crips and needed to be kept away from the rival Bloods and East Side Crips.

Detective Harless testified about a predicate offense which involved Bailey. On October 22, 2006, officers responded to a house within the territory of the West Side Crips on the dispatch about a man with a rifle. Bailey was present and detained, and the police recovered a loaded .22–caliber rifle. Bailey admitted he was a member of the West Side Crips and said his gang moniker was "Skeeter Bob." He was convicted of being a felon in possession of a firearm and participating in a criminal street gang (case No. BF116639A). Officer Harless believed he was an active gang member at the time, based on his review of the police report and conversation with the lead investigator.

In January 2010, Detective Harless arrested Bailey for possession of cocaine base; he was wearing a turquoise shirt and shoes.

. . .

### *BAILEY'S DEFENSE*

#### *Bailey's trial testimony*

Bailey testified at trial that he socialized with the West Side Crips when he was 14 years old. He became an associate when he was 16 years old and a member when he was 17 years old. He was affiliated with the 6th Street subset of the West Side Crips. Bailey's gang moniker was "Skeeter" or "Skeeter Bob." There were other "Skeeters" in the gang. He was never called "Skee."

Bailey testified that Brown was his cousin, and he was not a member of the West Side Crips or any other gang.

Bailey testified members of the West Side Crips sold drugs, and committed robberies, burglaries, and shootings. Bailey's primary source of income was dealing rock cocaine, but he sold drugs to support his family and not to benefit the gang. He denied that he had "juice" or seniority within the gang.

Bailey was convicted of possession of rock cocaine for sale and served a seven-year prison term. He was released in July 2004. Within a few days, he violated parole by associating with gang members, and he was returned to prison. He was again released on parole but arrested and charged with possession of a rifle and rock cocaine. Bailey testified the incident happened while he was helping a friend move, and the contraband did not belong to him. In 2006, Bailey pleaded guilty to the weapon charge and admitted the gang enhancement. He obtained his gang-related tattoos while he was in prison so he could fit in.

Bailey was released from prison in 2008. He moved out of the West Side Crips territory and lived with his sister. He later moved into an apartment with his fiancée, Tiffany Jackson, on North Half Moon Drive.

Bailey testified that he had lost interest in the gang. He stopped hanging out in their territory, covered his gang tattoos, and took classes to become an oil field worker. He also enrolled in Bakersfield College. Bailey claimed that a member could drop out of an African–American gang for no reason without facing retaliation. He covered a gang tattoo on his cheek by having a tattoo artist perform a procedure so the tattoo became part of his skin tone. He was in the process of that procedure when he was arrested in this case.

Bailey disputed the officers' testimony about Hood Day, and testified the event was a neighborhood picnic and not a gang activity. He admitted gang members attended the picnic at Lowell Park, which was within the West Side's territory. He denied that he was at the event in 2010 because he would have violated parole since gang members would have been there. Bailey claimed he was at an amusement park in Southern California on that day.

### The charged offenses

Bailey testified that on the morning of the burglary/robbery, he was at his apartment on North Half Moon Drive with Tiffany Jackson and their children. Brown, his cousin, was also there. Bailey was not afraid to hang out with Brown since he was not a gang member.

Bailey drove Brown to the residence where Brown's family lived. Brown needed to pick up some clothes. Brown's father lived on Pacheco Road near Pamela Street. Bailey and Brown were there for five or six minutes.

Bailey testified that when they were at the Brown family's house, he met Andrew Smith for the first time. Smith asked for a ride to get some marijuana. Bailey agreed. Bailey followed Smith's directions and drove Smith and Brown to Eve Street, near Pacheco Road. Brown and Smith got out of the car and Bailey stayed with the vehicle. Bailey testified he had no idea what Smith and Brown were going to do at that location. They were there for six or seven minutes. When Brown and Smith returned to the car, Bailey could smell marijuana on them.

Bailey drove Brown and Smith back to his apartment and parked in the alley, where the garbage cans were. Bailey stayed at his apartment for 10 minutes and then left around 11:40 a.m. to run more errands. Brown and Smith stayed at his apartment.

Bailey testified he returned to his apartment around 2:00 p.m. Tiffany Jackson and Brown were there. Smith was gone. After he returned, Jackson told him the police were in the alley. Brown left the apartment. Bailey admitted that he talked to Tiffany about what to say to the police, and they agreed to give the same false story about their activities that day.

Bailey testified the police arrived a short time later and conducted a parole search. The police asked Bailey where he had been that day, and whether he was a member of the West Side Crips. Bailey told them he wasn't in the gang anymore. Bailey gave a false story about his activities that day because he did not want to get in trouble. Bailey falsely said he and Tiffany had been near an apartment house on Eve Street because he was looking for car parts.

. . .

### Tiffany Jackson's testimony

Tiffany Jackson testified Bailey and Brown left their apartment to pick up Brown's clothes at his father's house. They returned with Smith; she had never met him before. Bailey left again to run errands. Smith left separately, and Brown stayed at the apartment.

After Bailey returned from his errands, Jackson saw a police officer in the alley with her neighbor. She went outside and asked what was going on. They said that they found someone's safe and important papers in the garbage can. Jackson went back to the

apartment and told Bailey and Brown.

Jackson testified that Brown "got hysterical. And he said that, f* *k man. I put that—I put it in there. It wasn't nothing in there so I threw it away." Brown also said "that bitch, she burned me on my weed. I gave her money for chronic and she gave me stress. I wanted my money back and she didn't give me my money back, so I took her shit."

Jackson testified that Bailey immediately became upset and hysterical. Brown left the apartment. Bailey and Jackson had a conversation, and the police arrived.

Jackson testified the police asked her about an incident at an apartment house on Pacheco Road, just east of Eve Street. Jackson falsely claimed she went there with Bailey to look for car parts. She lied because they knew the police would not believe anything Bailey said.

Jackson testified that a few days after Bailey was arrested, she went to the apartment complex where the robbery/burglary occurred. She asked the apartment manager if there were any empty units to rent, and whether there had recently been a robbery there. On October 26, 2010, Jackson returned to the apartment complex with several people: Brown's father; a woman who claimed to have purchased methamphetamine from Garcia; the robbery victim; and someone who spoke Spanish. She wanted to clear Bailey's name and did not threaten Garcia. Jackson testified Garcia agreed to speak with them, and she was not afraid of them. Jackson showed Bailey's photograph to Garcia, and Garcia said she "didn't know. He was just black." Jackson testified she knew "for a fact" that Garcia sold marijuana and methamphetamine.

*People v. Bailey-Banks*, No. F065678, 2014 WL 3533422, at *1-8 (Cal. Ct. App. July 17, 2014).

## II.     Discussion

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See* § 2254; *Harrington v. Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003). In a Section 2254 proceeding, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The standard that governs the federal court's habeas review depends on whether the state court decided petitioner's claims on the merits.

When a state court has adjudicated a petitioner's claims on the merits, a federal court reviews the state court's decision under the deferential standard of Section 2254(d). Section 2254(d) precludes a federal court from granting habeas relief unless a state court's decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts. *See* § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted). The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016). A federal habeas court has an obligation to consider arguments or theories that "could have supported a state court's decision." *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2557 (2018) (quoting *Richter*, 562 U.S. at 102). One rule applies to all state prisoners' petitions decided on the merits: the petitioner must show that the state court's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Even when a state court does not explicitly address a petitioner's claims on the merits, a Section 2254 petitioner still must satisfy a demanding standard to obtain habeas relief. When a state court gives no reason for denying a petitioner's habeas claim, a rebuttable presumption arises that the state court adjudicated the claim on the merits under Section 2254(d). *See Richter*, 562 U.S. at 99. And a federal habeas court's obligation to consider arguments or theories that could support a state court's decision extends to state-court decisions that offer no reasoning at all. *See Sexton*, 138 S. Ct. at 2557.

If a state court denies a petitioner's habeas claim solely on a procedural ground, then Section 2254(d)'s deferential standard does not apply. *See Visciotti v. Martel*, 862 F.3d 749, 760 (9th Cir. 2016). However, if the state court's decision relies on a state procedural rule that is "firmly established and regularly followed," the petitioner has procedurally defaulted on his claim and cannot pursue habeas relief in federal court unless he shows that the federal court should excuse his procedural default. *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016); *accord Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016). If the petitioner has not pursued his habeas claim in state court at all, the claim is subject to dismissal for failure to exhaust state-court remedies. *See Murray v. Schriro*, 882 F.3d 778, 807 (9th Cir. 2018).

If obtaining habeas relief under Section 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102. As the Supreme Court has explained, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id.* at 103 (citation omitted). The federal court's habeas review serves as a "guard against *extreme* malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (emphasis added).

Here, petitioner raises eight claims for habeas relief:

1. The prosecutor improperly introduced a document pertaining to the prosecution of Smith.

2. The prosecutor committed prosecutorial misconduct by during closing argument.

3. The jury instruction improperly shifted the burden of proof to petitioner.

4. The Court of Appeal erroneously concluded that the jury did not rely on the document from Smith's case.

5. Petitioner was improperly convicted as a principal and as an accessory after the fact for the same crime.

6. Petitioner had ineffective assistance of counsel because his counsel failed to object to the admission of the document from Smith's case.

7. The jury instruction omitted lesser included offenses.

       8.   The prosecutor failed to prove petitioner's prior strike under California's Three-Strikes Law.[2]

The Court of Appeal addressed all these claims on the merits in a reasoned opinion. Petitioner has not exhausted his fifth, seventh, and eighth claims because he has failed to present those claims to the California Supreme Court. The remaining claims fail on the merits.

### a.  Unexhausted Claims and Petitioner's Motion to Stay

Petitioner has conceded that he has not exhausted some of his claims, even though he does not state which claims are unexhausted. *See* ECF Nos. 27, 28. Earlier in the case, he moved to stay this proceeding pending his exhaustion of state-court remedies, but he did not provide any reason why staying this case was appropriate or explain why he could not exhaust his claims before filing his petition. Given the deficiency in petitioner's motion to stay, the court denied the motion to stay without prejudice and allowed petitioner to renew his motion to stay. *See* ECF Nos. 30, 31. After four months passed without petitioner renewing his motion to stay, this court gave another opportunity to renew his motion. *See* ECF No. 33. About seven months have passed, and petitioner still has not renewed his motion to stay. The court should decline to stay the case and should proceed with review of the petition.

We begin by identifying petitioner's unexhausted claims. Respondent has lodged petitioner's appellate briefs filed before the Court of Appeal and the California Supreme Court. *See* ECF No. 22. After comparing those briefs, we find that petitioner has not presented his fifth, seventh, and eighth claims to the California Supreme Court. *Compare* Lodged Docs. 29, 31, *with* Lodged Doc. 35. Because petitioner has not presented those claims to the California Supreme Court, he has not exhausted those claims. *See Cooper v. Neven*, 641 F.3d 322, 326 (9th Cir.

---

[2] For the fourth claim, petitioner states, "Jury misconduct—violation of due process and fair trial . . . Jury was exposed to prejudicial information . . . ." ECF No. 1 at 6. Petitioner then argues in a memorandum attached to the petition that the Court of Appeal erred by assuming that the jury did not rely on the allegedly prejudicial information, which petitioner identifies as the documents from Smith's case. *See id.* at 15. Petitioner does not explain how being exposed to the allegedly prejudicial evidence—introduced by attorneys and admitted by the trial court—constitutes jury misconduct. Thus, despite the label "jury misconduct," we take the fourth claim to be challenging the Court of Appeal's conclusion that the jury did not rely on the documents from Smith's case.

2011) ("Exhaustion requires the petitioner to . . . present his claims to the highest court of the state.").

The court need not stay this case even though petitioner has not exhausted all his claims. A procedural problem arises when a state prisoner in a Section 2254 proceeding files a mixed petition—a habeas petition that includes exhausted and unexhausted claims. Ordinarily, a state prisoner must exhaust state-court remedies for every habeas claim before pursuing a Section 2254 petition in federal court under the total exhaustion requirement, *Rose v. Lundy*, 455 U.S. 509, 518 (1982), and the AEDPA's one-year statute of limitations is not tolled by the filing of a Section 2254 petition, *Duncan v. Walker*, 533 U.S. 167, 181-82 (2001). Thus, if a petitioner files a timely but mixed petition in federal court, and the district court dismisses without prejudice for failure to exhaust, the one-year statute of limitations often expires by the time petitioner exhausts his remedies in state court and returns to federal court, thereby effectively precluding federal habeas review. *See Rhines v. Weber*, 544 U.S. 269, 275 (2005); *Dixon v. Baker*, 847 F.3d 714, 718-19 (9th Cir. 2017). Recognizing this problem, courts have allowed state petitioners to obtain federal review on mixed petitions by staying the Section 2254 proceedings in federal court while the petitioners pursue remedies in state court for unexhausted claims. *See generally Rhines*, 544 U.S. at 273; *Kelly v. Small*, 315 F.3d 1063 (9th Cir. 2003), *overruled on other grounds by Robbins v. Carey*, 481 F.3d 1143 (9th Cir. 2007). Failure to give petitioners the opportunities to stay the Section 2254 proceedings can constitute abuse of discretion in some cases, *see Dixon*, 847 F.3d at 719, but a stay is not appropriate hare.

A state prisoner with a mixed petition may stay his Section 2254 proceeding by following one of two procedures: the *Rhines* procedure or the *Kelly* procedure. *See Rhines*, 544 U.S. at 277; *Kelly*, 315 F.3d at 1069-70; *King v. Ryan*, 564 F.3d 1133, 1139-40 (9th Cir. 2003) (distinguishing *Kelly* and *Rhines*). Under *Rhines*, a district court may stay the Section 2254 proceeding while the petitioner exhausts his state-court remedies, and all claims remain pending in federal court and protected from the one-year statute of limitations. *See Rhines*, 544 U.S. at 277-78. *Rhines* applies when the petitioner shows: (1) there is "good cause" for the petitioner's failure to exhaust his claims in state court; (2) the unexhausted claims are not "plainly meritless"; and (3) the

petitioner has not engaged in "abusive litigation tactics or intentional delay." *Id*. If the petitioner

fails to satisfy the requirements under *Rhines*, the district court must consider staying the

proceeding under *Kelly* by allowing "the petitioner to delete the unexhausted claims and to

proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair

the petitioner's right to obtain federal relief." *Dixon*, 847 F.3d at 719.

Under *Kelly*, a petitioner voluntarily dismisses unexhausted claims from a mixed petition,

and the court stays the proceeding only as to the exhausted claims. *See King*, 564 F.3d at 1135.

The petitioner may then pursue remedies for his unexhausted claims in state court and later

amend the stayed petition in federal court, adding back to the petition the newly-exhausted

claims. *See id*. To stay a Section 2254 proceeding under *Kelly*, the petitioner need not show

good cause, but the newly exhausted claims are not protected from the one-year statute of

limitations. *See id*. at 1140-41.

Here, petitioner has not shown that a stay is appropriate under *Rhines* or *Kelly*. Under

*Rhines*, petitioner has not shown good cause.[3] This court has explained to petitioner how to

obtain a stay under *Kelly*—that is, by voluntarily dismissing the unexhausted claims. *See* ECF

No. 30, at 2-5. Several months have passed since the court has explained the *Kelly* procedures,

*see id*., but petitioner still has not renewed his motion to stay. Accordingly, petitioner has not

satisfied the requirements of *Rhines* or *Kelly*.

We next consider whether the court must dismiss the entire petition under the total

exhaustion requirement. When a habeas petitioner has not attempted to present his unexhausted

claims in state court, the court must consider whether the petitioner still has any state remedy

---

[3] In his motion to stay, which the court denied without prejudice, petitioner stated:

> I would like to stay and abey Federal Petition Case # (1:15cv01839-
> AWI-MJS H.C.) I currently is exhausting claims in Superior Court
> case #HC015533A.

> *Rhines v. Weber*, [544 U.S. 269] (2005) permits this Court to stay
> the instant petition while Petitioner exhausts his claims in the state
> courts.

ECF Nos. 27, 28. After a search of the state courts' dockets, we have not found that petitioner
has presented his unexhausted claims to the California Supreme Court.

available before dismissing the petition for lack of exhaustion.  *See Johnson v. Zenon*, 88 F.3d 828, 831 (9th Cir. 1996) (concluding that petitioner has not exhausted his claims in state court but nonetheless remanding, with instructions to consider whether any state remedy remains available).  If the petitioner still has available state remedies, the court must dismiss the petition without prejudice, and the petitioner may return to state court to exhaust his claims.  *See Johnson v. Lewis*, 929 F.2d 460, 464 (9th Cir. 1991).  If the petitioner would now be precluded from presenting unexhausted claims, for example because of a procedural bar under state law, then the petitioner "meets the technical requirements for exhaustion; there are no state remedies any longer available' to him."  *Coleman v. Thompson*, 501 U.S. 722, 732 (1991); *accord Woods v. Sinclair*, 764 F.3d 1109, 1129 (9th Cir. 2014).  The court may not review the merits on a particular claim if the petitioner has procedurally defaulted on that claim.  *See Woods v. Sinclair*, 764 F.3d 1109, 1129 (9th Cir. 2014).

Here, the dismissal of the entire petition is inappropriate because petitioner now has no state remedy available for the unexhausted claims.  The Court of Appeal decided petitioner's direct appeal more than four years ago, in July 2014.  *See Bailey-Banks*, 2014 WL 3533422.  All of petitioner's unexhausted claims arise from the circumstances that were known to petitioner, as indicated by the fact that he briefed those claims on direct appeal before the Court of Appeal.  *See* Lodged Docs. 29, 31.  Given the unexplained delays in presenting his claims to the California Supreme Court, petitioner has procedurally defaulted on his unexhausted claims.  *See In re Reno*, 55 Cal. 4th 428, 461-62 (2012).  Because petitioner cannot return to state court to present his unexhausted claims, he has no state remedy available for those claims.  The court should therefore decline to dismiss the entire petition and address the merits of petitioner's exhausted claims.  Petitioner has procedurally defaulted on his unexhausted claims, so we do not reach their merits.

In sum, petitioner cannot prevail on his unexhausted claims that he was unlawfully convicted as both a principal and an accessory after the fact (Claim 5), that the jury instruction erroneously omitted lesser included offenses (Claim 7), and that the prosecutor failed to prove a prior strike under California's Three-Strikes law (Claim 8).  The court need not stay the case or

14

1    reach the merits of these unexhausted claims.

2            **b. Admission of a Document from Smith's Case**

3            Before trial, the prosecutor stated that he intended to introduce People's Exhibit 3, a 16-

4    page summary of docket activities from Smith's case—without presenting Smith as a witness

5    against petitioner—to establish predicate offenses in support of the gang allegations against

6    petitioner. *See* SCT 38-54. Exhibit 3 summarized the procedural history in Smith's case (as a

7    docket report from the CM/ECF system of a federal district court would). In particular, Exhibit 3

8    noted that Smith had pleaded no contest to a first-degree burglary charge and that Smith admitted

9    the government's gang allegation in connection with that offense. *See id* at 39, 50; *Bailey-Banks*,

10   2014 WL 3533422, at *11.[4] The trial court stated that it would not allow the prosecutor to

11   introduce Exhibit 3, explaining that the exhibit was inadmissible under California's rules of

12   evidence and that the introduction of Exhibit 3 might violate petitioner's right to confront

13   witnesses against him. RT 2:255-56. Before closing argument, the trial court asked the

14   prosecutor which exhibits he wished to introduce into evidence, and the prosecutor replied that he

15   wished to introduce "everything," except for an unredacted transcript and a recording of a 911

16   call and a DVD; the list of excluded items did not include Exhibit 3. *See* RT 13:1525; *Bailey-*

17   *Banks*, 2014 WL 3533422, at *11. The defense counsel did not object, and the court admitted

18   Exhibit 3 into evidence despite its pretrial ruling. In this habeas proceeding, petitioner contends

19   that the admission of Exhibit 3 violated his right to confront witnesses against him (Claim 1) and

20   that his counsel was ineffective in failing to object to the admission of Exhibit 3 (Claim 6).

21   Petitioner also argues that the Court of Appeal erred by concluding that the admission of

22   Exhibit 3 was harmless.

23           The standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993), governs the harmless-

24   error inquiry. *See Dixon v. Williams*, 750 F.3d 1027, 1034 (9th Cir. 2014) (per curiam).

25   Under *Brecht,* a petitioner can obtain federal habeas relief only if "the error had substantial and

26

27   [4] Petitioner states that a plea agreement between Smith and the government were introduced into
     evidence, ECF No. 1 at 5-6, but this is inaccurate. Exhibit 3 summarizes Smith's plea to some
28   degree, but it does not contain the plea agreement itself. *See* SCT 38-54.

injurious effect or influence in determining the jury's verdict." 507 U.S. at 637. To satisfy this standard, the court must have "grave doubt" as to the outcome, meaning that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *See O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). The *Brecht* standard applies "in virtually all" Section 2254 cases, *see Fry v. Pliler*, 551 U.S. 112, 117 (2007), and only in rare cases involving truly egregious errors can a federal court grant habeas relief without the harmless-error inquiry.[5]

Here, the Court of Appeal reasonably concluded that the admission of Exhibit 3 was harmless, given the government's other evidence showing Smith's involvement with the burglary and robbery. Mason Woessner, a police officer, testified:

> **Q** Were you later able to identify who Baby Rags was?
>
> **A** Yes.
>
> **Q** Who?
>
> **A** Andrew Smith.
>
> **Q** And during the course of your interview with Mr. Brown, was he able to describe the actions between himself and Mr. Smith inside that apartment?
>
> **A** Yes, he did. . . . He said that Mr. Smith had mentioned to him that there was some money at the apartment and also that the people at the apartment sell crystal methamphetamine. He said he went to the apartment along with Mr. Smith. At one point Mr. Smith entered the apartment through a window—I believe it was a kitchen window—and then opened the front door and allowed Mr. Brown inside. Once they were inside, he said Mr. Smith produced a firearm and pointed it at the female occupant. He then said that he looked around in the rooms for money, and at one point he found a

---

[5] Cases that would circumvent the harmless-error inquiry are truly rare. Such a case is one involving "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct" that "might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." *See Brecht*, 507 U.S. at 638 n.9. Examples of such egregious errors include requiring representation by counsel who has a conflict of interest, *Holloway v. Arkansas*, 435 U.S. 475, 489 (1978), trial before a judge who has a direct pecuniary interest in the outcome, *Tumey v. State of Ohio*, 273 U.S. 510, 535 (1927), precluding counsel of choice from representing a criminal defendant, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006), and precluding exculpatory evidence during a cross-examination, *see Holley v. Yarborough*, 568 F.3d 1091, 1098 (9th Cir. 2009).

safe in one of the bedrooms, retrieved the safe, removed it from the
bedroom, and then, as they were leaving the apartment, he said he
dropped the safe and Mr. Smith picked it up.

RT 4:480-81.[6] Woessner's testimony allowed the jury to infer Smith's involvement in the

burglary and robbery. Because the jury could infer Smith's involvement independent of

Exhibit 3, the record here does not raise a grave doubt that the information contained in Exhibit 3

affected the outcome of the trial.

Petitioner argues that the court should hold an evidentiary hearing to examine whether the

jurors in his case considered Exhibit 3. ECF No. 1 at 14. Whether the jurors considered

Exhibit 3 does not affect our conclusion that the record does not raise a grave doubt as to the

exhibit's effect on the trial's outcome. Thus, the court should decline to hold an evidentiary

hearing.

### c. Prosecutorial Misconduct

Petitioner contends that the prosecutor committed a misconduct during the rebuttal portion

of the closing argument by expressing his personal opinion. *See* ECF No. 1 at 5, 17-18. During

the government's rebuttal, the prosecutor said:

Remember, look at all the evidence. Don't just look at the stuff the
attorneys tell you to because we are biased. I am the most biased
person in the courtroom. *I'll tell you right now, I believe to the
bottom of my feet these guys did it. That's why I am here*.

RT 14:1703 (emphasis added). Again, the Court of Appeal concluded that any error was

harmless, and we see no error.

The prosecutor's comment meant that the attorneys' statements were not evidence, and the

comment was directing the jury to weigh the evidence setting aside the attorneys' statements. In

addition, when the defense counsel objected to the challenged portion of the prosecutor's rebuttal,

the trial court instructed the jury not to consider the comment:

Ladies and gentlemen, the attorneys, as I stated previously, are
advocates for their side and oftentimes they will make statements or
say things during their argument that may be somewhat improper or
across the line.

---

[6] No attorney objected to the admission of the foregoing testimony from Woessner.

> At this time, based on [the prosecutor's] last statement, I am going to order that you disregard his last statement regarding believing from the bottom of his feet.

RT 14:1703-04. "[W]e presume a jury follows its instructions," *Poyson v. Ryan*, 879 F.3d 875, 898 (9th Cir. 2018), and given the trial court's instruction to disregard the statement at issue, we see no grave doubt as to the outcome of the trial.[7]

**d. Jury Instruction**

Before its revision in September 2017, CALCRIM No. 301, a model jury instruction in California, stated the following:

> [Except for the testimony of <insert witness's name>, which requires supporting evidence [if you decide (he/she) is an accomplice],] (the/The) testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence.

*See also Bailey-Banks*, 2014 WL 3533422, at *22. The commentary for CALCRIM No. 301 provided that the trial court should insert the first bracketed language if the testimony of an accomplice or other witness required corroboration. *See id.*; *People v. Chavez*, 39 Cal. 3d 823, 831 (1985) (discussing standard on accomplice testimony). California's model jury instructions also included CALCRIM No. 334, which instructed the jury on the law applicable to accomplices. The jury in petitioner's case incorporated CALCRIM Nos. 301 and 334:

> **301**
>
> *Except for the testimony of Larry Bailey, which requires supporting evidence*, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence.
>
> **334**
>
> *Before you may consider the statement or testimony of Larry Bailey as evidence against Rayshaun Brown, you must decide whether Larry Bailey was an accomplice to those crimes*. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if, one, he or she personally committed the crime or, two, he or she knew of the criminal purpose of the person who

---

[7] Petitioner also states that the prosecutor unlawfully vouched for some unidentified witness's credibility. ECF No. 1 at 5. However, he cites no evidence in support and does not explain why this claim, even if supported, would warrant habeas relief.

committed the crime; and, three, he or she intended to and did, in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime or participate in a criminal conspiracy to commit the crime.

The burden is on the defendant to prove that it is more likely than not that Larry Bailey was an accomplice.

If you decide that a declarant or witness was not an accomplice, then supporting evidence is not required and you should evaluate his or her (statement/ or testimony) as you would that of any other witness.

If you decide that a (declarant/ or witness) was an accomplice, then *you may not convict Defendant Brown based on Defendant Bailey's (statement/ or testimony) alone*. You may use the statement or testimony of an accomplice to convict the defendant only if:

1. The accomplice's (statement/ or testimony) is supported by other evidence that you believe;

2. That supporting evidence is independent of the accomplice's (statement/ or testimony); AND

3. That supporting evidence tends to connect the defendant to the commission of the crimes.

Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crimes, and it does not need to support every fact (mentioned by the accomplice in the statement/ or bout which the accomplice testified.)

CT 2:364, 366 (emphasis added); *see also* RT 13:1552. The Court of Appeal concluded that the instructional error was harmless, relying on the italicized portions of CALCRIM No. 334 above. *See Bailey-Banks*, 2014 WL 3533422, at *23. In this habeas proceeding, petitioner contends that the trial court's instruction on CALCRIM No. 301 confused the jury and inappropriately shifted the burden of proof from the government to petitioner.

There is no grave doubt here as to the effect of the instruction on the outcome of petitioner's trial. The trial court's instruction on CALCRIM No. 301 could confuse the jury if it were read in isolation, but CALCRIM No. 334 provided, "If you decide that a declarant or witness was not an accomplice, then supporting evidence is not required and you should evaluate his or her (statement/ or testimony) as you would that of any other witness." CT 2:364, 366. A problem could arise if the jury did find petitioner to be an accomplice: even though CALCRIM

No. 344 provided that petitioner's testimony could not be used to convict petitioner's codefendant Brown, it did not provide a similar cautionary language for evaluating petitioner's own testimony when the testimony is used for his *own* defense.  That is, the jury could believe that, when petitioner used his own testimony for his own defense in the joint trial, that testimony required corroboration because petitioner was an accomplice.

The problem for petitioner is that his testimony was in fact corroborated.  Woessner testified that in a statement made to the police, Brown denied petitioner being involved in the underlying offenses.  RT 12:1465.  Tiffany Jackson, who had lived with petitioner, testified that petitioner tried to "stay clear" of West Side Crips such as removing his gang tattoos, and that testimony corroborated petitioner's testimony that he was no longer a member of that gang.  RT 11:1319-20.  Jackson also testified that she decided not to allow Brown drive a car but allowed petitioner to give Brown a ride, and that testimony supports the inference that petitioner had no plan to be the getaway driver for Brown and Smith; it also corroborates petitioner's testimony that he had no intent to be involved in the robbery or burglary.  RT 11:1146-47.  Jackson's testimony that she heard Smith's name for the first time on the day of petitioner's arrest corroborates petitioner's testimony that he met Smith for the first time on the day of the offenses.  RT 11:1356.  Given these witnesses' testimony, a reasonable jurist could find that petitioner's testimony was corroborated, that the jury treated petitioner like any other witness, and that the jury decided this case based on witnesses' credibility, weighing conflicting evidence from petitioner and the government.  Again, the record does not raise a grave doubt as to the instruction's impact on the outcome of the trial.

### e.  General References to Due Process and Fair Trial

For each of his habeas claims, petitioner states in passing that his rights to due process and a fair trial have been violated.  *See* ECF No. 1 at 5-7.  General appeals to broad principles do not state cognizable federal habeas claims.  *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004).  Only the holdings in the Supreme Court's decisions can identify "clearly established Federal law."  *See Atwood v. Ryan*, 870 F.3d 1033, 1046 (9th Cir. 2017).  Petitioner does not develop an argument explaining how his rights to due process and fair trial were violated.  He also does not

1    identify any Supreme Court holding supporting his claim. Thus, the court should not grant

2    habeas relief based on petitioner's vague references to the principles of due process and fair trial.

3 **III. Certificate of Appealability**

4        A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

5 court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253;

6 *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254 Cases

7 requires a district court to issue or deny a certificate of appealability when entering a final order

8 adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d

9 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes

10 "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This

11 standard requires the petitioner to show that "jurists of reason could disagree with the district

12 court's resolution of his constitutional claims or that jurists could conclude the issues presented

13 are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord*

14 *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

15        Here, petitioner has not made a substantial showing of the denial of a constitutional right.

16 Thus, the court should decline to issue a certificate of appealability.

17 **IV. Findings and Recommendations**

18        The court should deny the petition for a writ of habeas corpus and decline to issue a

19 certificate of appealability.

20        These findings and recommendations are submitted to the U.S. District Court Judge

21 presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of

22 Practice for the United States District Court, Eastern District of California. Within 14 days of the

23 service of the findings and recommendations, petitioner may file written objections to the

24 findings and recommendations with the court and serve a copy on all parties. That document

25 must be captioned "Objections to Magistrate Judge's Findings and Recommendations." The

26 District Judge will then review the findings and recommendations under 28 U.S.C.

27 § 636(b)(1)(C).

28

IT IS SO ORDERED.

Dated:     March 8, 2019     

UNITED STATES MAGISTRATE JUDGE

No. 202